1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KATIE OGDON, an individual, on behalf          No.  1:20-cv-00709-DAD-SKO
     of herself and all others similarly situated,

12
                    Plaintiff,
13                                                   ORDER GRANTING DEFENDANTS'
             v.                                      MOTION TO DISMISS, IN PART, AND
14                                                   TRANSFERRING ACTION
     GRAND CANYON UNIVERSITY, INC.,
15   et al.,                                         (Doc. Nos. 24, 25)

16                  Defendants.

17

18

19          This matter is before the court on the motion to dismiss and motion to strike filed by

20   defendants on September 17, 2020.[1]  (Doc. Nos. 24, 25.)  Pursuant to General Order No. 617

21   addressing the public health emergency posed by the COVID-19 pandemic, defendants' motions

22

23   [1]  The undersigned apologizes for the excessive delay in the issuance of this order.  This court's
     overwhelming caseload has been well publicized and the long-standing lack of judicial resources
24   in this district long-ago reached crisis proportion.  That situation has now been partially addressed
     by the U.S. Senate's confirmation of a district judge for one of this court's vacancies on
25   December 17, 2021.  Nonetheless, for over twenty-two months the undersigned was left presiding
     over approximately 1,300 civil cases and criminal matters involving 735 defendants.  That
26   situation resulted in the court not being able to issue orders in submitted civil matters within an
     acceptable period of time, even now as the undersigned continues to work through the predictable
27   backlog.  This has been frustrating to the court, which fully realizes how incredibly frustrating it
     is to the parties and their counsel.
28

                                                    1

1   were taken under submission on the papers.  (Doc. No. 26.)  For the reasons explained below, the

2   court will grant defendants' motion to dismiss in part, transfer this action, and decline to rule on

3   the pending motion to strike in light of the transfer.

4   **FACTUAL BACKGROUND**

5   On May 20, 2020, plaintiff Katie Ogdon filed the complaint initiating this putative class

6   action lawsuit against defendants Grand Canyon University, Inc. ("GCU") and Grand Canyon

7   Education, Inc. ("GCE"), (collectively, the "corporate defendants"), alleging violations of

8   California's consumer protection laws.  (Doc. No. 1.)  On August 4, 2020, plaintiff filed the

9   operative first amended complaint ("FAC"), adding a civil racketeering claim and naming three

10  corporate officers as additional defendants:  Brian Mueller, Dan Bachus, and Stan Meyer.  (Doc.

11  No. 18 at ¶¶ 9–11.)

12  Plaintiff alleges as follows in her FAC.[2]

13  **A.     Background on Defendants and the University**

14  Defendant GCU, formerly known as Gazelle University, is an Arizona non-profit

15  corporation registered to do business in California, and its sole member is non-party Grand

16  Canyon University Foundation (the "Foundation").  (*Id.* at ¶ 7.)  Defendant GCE, a Delaware

17  corporation registered to do business in California, is a publicly traded holding company that

18  controls GCU.  (*Id.* at ¶ 8.)  At all relevant times, defendant Mueller was the president of the

19  Foundation, GCU, and GCE; defendant Bachus was the chief financial officer of GCE; and

20  defendant Stan Meyer was the chief operating officer of GCE.  (*Id.* at ¶¶ 9–11.)

21  Prior to July 2018, GCE operated Grand Canyon University (the "University") as a for-

22  profit institution, as it had done since purchasing the University in 2004, when the University was

23  "a small, freestanding, Christian non-profit corporation with a small brick and mortar campus in

24  Arizona" facing closure.  (*Id.* at ¶¶ 29, 31.)  In response to the Department of Education's passage

25  of several new regulations in 2014 "to curb the worst abuses of for-profit schools," including by

26

---

27  [2]  The court will not provide a comprehensive or exhaustive summary of plaintiff's FAC, which includes 282 paragraphs spanning 79 pages.  Rather, the court summarizes the allegations here and in the analysis section below, focusing on allegations that are relevant to the court's resolution of the pending motions.

28

2

1  requiring for-profit schools to comply with certain disclosure requirements "to better inform
2  prospective students as to the likelihood they will obtain gainful employment in their field,"
3  defendants started to "plan to restructure themselves as a non-profit" so that the University could
4  continue to operate unburdened by those regulations.  (*Id.* at ¶¶ 51, 55.)  As part of this plan, in
5  July 2018, GCE sold the University assets to GCU.  (*Id.* at ¶ 59.)  Together, GCU and GCE
6  operate the University, including "an online education program, through which they offer
7  graduate degrees in a variety of professional areas that are subject to state regulation, such as
8  health care and education ('Regulated Professions')."  (*Id.* at ¶¶ 1, 29, 41.)  The online program
9  became the centerpiece of the University's graduate offerings and the focus of GCE's aggressive
10  marketing and recruitment efforts because they could reach graduate students across the country
11  who did not need to relocate to Arizona or be located in geographic proximity to the University's
12  campus in Arizona.  (*Id.* at ¶ 39.)

13      Pursuant to a corporate restructuring and various agreements that are detailed in the FAC,
14  but need not be summarized here, GCU (the non-profit) outsourced operation of the University to
15  GCE (the for-profit), but GCU maintained nominal control of the University in an effort to obtain
16  non-profit status for the University.  (*Id.* at ¶¶ 13, 29, 31, 38, 41, 59–66.)  For example, GCU
17  "provide[s] the academic instruction and [is] the entity receiving tuition dollars, obtained by
18  students, including those in California, from the federal student loan program," and GCU "pay[s]
19  GCE those tuition dollars to perform various services, including most importantly, conducting the
20  marketing and recruiting of new students from around the country, including California, to
21  enroll."  (*Id.* at ¶ 64.)  Defendants petitioned the Department of Education to recognize the
22  University as a non-profit, but their petition was denied on November 6, 2019, for several reasons
23  that are detailed in the allegations of the FAC.  (*Id.* at ¶¶ 67–74.)  In denying non-profit
24  recognition, the Department instructed GCU to comply with all federal regulations governing for-
25  profit entities in its operation of the University and to not to refer to itself as a non-profit.  (*Id.* at ¶
26  75.)

27      The University obtained its regional accreditation from Higher Learning Commission
28  ("HLC"), a regional accreditation agency.  (*Id.* at ¶¶ 56–57, 77.)  "To participate in the federal

student loan program, a university must have accreditation from a regional accreditation agency."
(*Id.* at ¶ 77.)  However, in addition to regional accreditation, "educational institutions and their
programs are often required to be accredited by various specialized accreditation programs.  For
example, many states require those desiring to work in certain Regulated Professions to obtain
their education from a school or program that has been specially accredited to provide education
for that purpose."  (*Id.* at ¶ 78.)  "[T]he process of obtaining and maintaining professional
accreditation of a program can be time consuming and expensive" because "[d]ifferent states may
have different standards for a given Regulated Profession, and a school that wishes to prepare
people to work in a variety of different jurisdictions will need to invest in ensuring their programs
meet any differing standards."  (*Id.* at ¶ 80.)  According to plaintiff, "[b]ecause Defendants divert
tuition dollars into shareholder profits, they cannot offer educational programs that are
professionally accredited in all jurisdictions."  (*Id.* at ¶ 82.)  Many of the University's
"professional degree and certification programs are not accredited" for their professional
purposes.  (*Id.* at ¶ 88.)  For example, most of the University's healthcare degree programs and
educational master's and doctorate programs and are not accredited in California or most other
states.  (*Id.* at ¶¶ 89–90.)

> **B.      Defendants Allegedly Defraud Plaintiff into Enrolling in the University**

Plaintiff, a resident of Fresno, California, had a goal of becoming a mental health
therapist.  (*Id.* at ¶ 167.)  After completing her bachelor's degree in 2015, she was unable to begin
her graduate studies at that time, so she started working full-time at a high school in Fresno.  (*Id.*
at ¶ 168.)  In the summer of 2017, to pursue her goal of becoming a mental health therapist in
California, plaintiff began to research masters' degree programs and "planned to obtain a master's
degree from an accredited school that would allow her to work in California when she completed
the degree."  (*Id.*)  She was particularly interested in online programs because they offer flexible
schedules and start dates.  (*Id.*)  When plaintiff searched on Google for online programs, GCU
"came up both in the sponsored search results and the general search results."  (*Id.* at ¶ 169.)
Plaintiff had heard of GCU because she recalled seeing television commercials for their
undergraduate program during the basketball season and she had seen posters advertising the

University to graduating seniors during her employment at the high school in Fresno. (*Id.* at

¶ 171.) These advertisements "led her to believe [the University] was a legitimate educational

institution." (*Id.*)

In the summer of 2017, plaintiff completed an online form on the University's website.

(*Id.* at ¶ 173.) A couple of days later, Michael Granitz, a "Counselor" from the University, called

plaintiff in an attempt to enroll her in the University. (*Id.* at ¶ 174.) "Over the next several

weeks, plaintiff had a number of conversations with Mr. Granitz about the possibility of enrolling

at the University," and "[s]he informed him that her goal was to become a mental health

therapist." (*Id.* at ¶¶ 175–176.) "Mr. Granitz knew that Ms. Ogdon lived in California, where she

intended to practice after graduation," and "their conversations naturally centered around

obtaining a degree so she could practice in California where she already lived and also wanted to

work." (*Id.* at ¶ 176.) "Mr. Granitz assured [plaintiff] that the University had an excellent

program that would meet her needs." (*Id.*)

Because the mental health profession in the state of California is a Regulated Profession,

plaintiff "knew she would have to obtain a degree from a program accredited for that purpose."

(*Id.* at ¶¶ 1, 177.) During a phone call with Mr. Grantiz, plaintiff asked him if the program was

approved by the American Psychological Association and appropriately accredited for licensure

in California. (*Id.* at ¶ 177.) "Mr. Granitz assured her that the program was accredited both by

the American Psychological Association and California licensing authorities," and "the program

was covered under the HLC's accreditation, and that that accreditation was like an umbrella that

covered everything." (*Id.* at ¶¶ 56, 177.) Mr. Granitz told plaintiff "that she would be able to

work in her state with the HLC accreditation," and he "lied that the umbrella HLC accreditation

was superior to other accreditation because with it, she could teach psychology, obtain a PhD, or

pursue a variety of opportunities." (*Id.* at ¶ 177.) Unbeknownst to plaintiff at the time, HLC

provided the University with the regional accreditation it needed to participate in the federal

student loan program; HLC did not provide specialized or professional accreditation for the

University's various degree programs, accreditations which are often required for students who

want to work in Regulated Professions. (*Id.* at ¶¶ 77, 78.) Despite Mr. Granitz's representations,

HLC regional accreditation "is not sufficient for [plaintiff's] chosen Regulated Profession in the state of California." (*Id.* at ¶ 177.)

"Mr. Granitz pursued [plaintiff] with enthusiastic sales calls filled with false explanations about accreditation that led [her] to believe that a degree from the University would not only allow her to be a mental health therapist in California," but that it would also "afford more options that she might not have if she selected a program that had been certified only by the American Psychology Association, and not by the larger HLC umbrella." (*Id.* at ¶ 178.) During these phone calls, Mr. Granitz intentionally omitted material information, namely "that the program was not in fact approved and accredited by the American Psychology Association" and that plaintiff would not be qualified for licensure to work as a mental health therapist in the state of California following completion of the University's program. (*Id.* at ¶¶ 179–80.)

On September 6, 2017, defendants sent plaintiff a notice of her "acceptance" to the University, and Mr. Granitz continued to call her "two or three times a week to pressure her to make a decision, complete her financial aid forms, and enroll," emphasizing that she could start her classes the next week and "present[ing] a very thrilling vision of her future and urg[ing] her not to wait to begin it." (*Id.* at ¶¶ 182–84.) On September 20, 2017, plaintiff transmitted her formal acceptance of her enrollment offer, and Mr. Granitz enrolled plaintiff in the University's Master of Science in Psychology with an Emphasis in Health Psychology program (the "Program"). (*Id.* at ¶ 187.) According to plaintiff, her "enrollment was in response to [d]efendants' high-pressure tactics and in reliance on [d]efendants' omission regarding the true nature of the master's program's accreditation." (*Id.* at ¶ 186.)

In October 2017, before beginning her studies, plaintiff spoke on the phone with another counselor at the University, Sabrina Landa, concerning the University's accreditation to ensure that the Program was what she needed to become a mental health therapist in California. (*Id.* at ¶ 188.) During that phone call, Ms. Landa assured plaintiff that the Program "would qualify her for licensure in the state of California." (*Id.*) Based on the assurances from Mr. Granitz and Ms. Landa, plaintiff began her classes. (*Id.* at ¶ 189.)

/////

1        In the spring of 2019, plaintiff began researching online regarding the process to become

2   licensed in California because she received little support from the University, including from her

3   then-assigned counselor, Chelsea Bebb.  (*Id.* at ¶¶ 190, 193.)  Plaintiff visited the California

4   Board of Behavioral Sciences website, where she learned that 60 credits and an internship were

5   required to become licensed.  (*Id.* at ¶ 193.)  Plaintiff had completed only 36 credits.  (*Id.*)

6   Plaintiff then reached out to Ms. Bebb for clarification and to ask about getting an internship.

7   (*Id.*)  Ms. Bebb told plaintiff that her Program did not require an internship.  (*Id.*)  Plaintiff

8   pressed Ms. Bebb for clarification, reminded her that California required an internship for

9   licensure, and asked if the University has a way to connect her with the right people in California,

10  but Ms. Bebb refused to assist or provide clarification.  (*Id.*)  Instead, Ms. Bebb told plaintiff that

11  she should take additional classes if she needed to complete 60 units.  (*Id.*)  Plaintiff became

12  concerned regarding the disconnect between her and Ms. Bebb as to the next steps in obtaining

13  her license and began contacting organizations in California for information.  (*Id.* at ¶ 194.)

14  Plaintiff discovered that the University "was not accredited in California and that she could not

15  become a California-licensed mental health therapist as she had been led to believe by Defendants

16  and their representatives."  (*Id.*)

17        In May 2019, plaintiff confronted Ms. Bebb and her supervisor, and they blamed the

18  situation on "confusion with [plaintiff's] first advisor."  (*Id.* at ¶ 195.)  On a phone call with

19  plaintiff, Ms. Bebb even tried to talk plaintiff "into taking *another* graduate program, a Master's

20  in Clinical Mental Health Counseling, even though Ms. Bebb and Defendants knew that such a

21  change would have resulted in hundreds of further wasted hours, tens of thousands in additional

22  student loans, and, ultimately, the same licensure problems in California."  (*Id.* at ¶ 196.)

23        Plaintiff finished her degree in May 2019, completing the 36-unit Program.  (*Id.* at

24  ¶¶ 197–98.)  Upon further research, plaintiff learned that the University's Program was "woefully

25  insufficient for [her] needs from the start," because "California requires a post-graduate degree

26  program with 60 degree units to obtain licensure in mental health therapy," and the University

27  "has no program that would be accepted by the state of California towards becoming a licensed

28  mental health therapist."  (*Id.* at ¶ 198.)  Plaintiff tried to transfer her credits to an accredited

1   school, but "no accredited school will give any credit for [University] courses." (*Id.* at ¶ 200.)

2   Plaintiff "never would have stayed in the [P]rogram if not for the lies and omissions of Ms.

3   [Landa] that the [P]rogram was accredited by California." (*Id.* at ¶ 203.)  Plaintiff incurred over

4   $22,000.00 in federal student loan debt to obtain her degree. (*Id.* at ¶ 199.)

5            **C.      Defendants' Alleged Scheme to Defraud Graduate Students**

6            Plaintiff alleges that what happened to her was not a unique experience.  Rather, she is

7   one of many victims of defendants' alleged "nationwide racketeering scheme to defraud graduate

8   students in connection with the operation of a for-profit university" by advertising graduate

9   degree programs in Regulated Professions as being suitable for employment even though those

10  programs do not meet the accreditation standards of licensing boards in the states where students

11  will seek employment. (*Id.* at ¶¶ 1, 5, 162–66.)  According to plaintiff, "[w]ithout the form of

12  accreditation required to qualify the students for licensure and/or practice in Regulated

13  Professions, the University's online degree programs are worthless to students in these fields."

14  (*Id.* at ¶ 89.)  "Because licensure is a necessary precursor to post-graduate employment in these

15  professional fields, no reasonable student would enroll in professional degree programs if they

16  knew that the degree would not qualify them to work in their desired profession." (*Id.* at ¶ 1.)

17  Plaintiff seeks to hold defendants accountable and represent a class of "[a]ll persons who were

18  enrolled in an online professional graduate degree or certificate program at the University that

19  was not accredited for licensure in the person's home state," and represent a California subclass

20  of "[a]ll Class members who were citizens of the state of California at the time of their

21  enrollment." (*Id.* at ¶¶ 5, 204.)

22           Plaintiff alleges that "[d]efendants have devised a comprehensive, nationwide marketing

23  and recruiting program that relies on high pressure, deceptive sales tactics to trick students into

24  enrolling, without regard to their qualifications or educational needs, and without regard to

25  whether the programs are suitable for practicing in Regulated Professions in a given geographic

26  area." (*Id.* at ¶ 93.)  "This marketing and recruitment program has been under the control of GCE

27  for the entire Class period, and accordingly, is operated under the direction and oversight of the

28  three Individual Defendants [Mueller, Bachus, and Meyer]." (*Id.* at ¶ 93.)  "With the approval of

all Defendants, GCE directs its marketing team in Arizona to direct online internet ads to potential students that search online for accredited programs, including potential students in California," even though "[d]efendants know the University cannot provide a degree suitable for work in the searcher's state, such as California." (*Id.* at ¶ 97.) Defendants also use social media, published advertisements in national media outlets, and run television commercials—none of which "make disclosures regarding the suitability of the programs for practice in the Regulated Professions in various geographic areas." (*Id.* at ¶ 136.)

In addition, plaintiff alleges that defendants instruct the hundreds of recruiters that GCE employs throughout the country, including in California, to hold themselves out using titles such as "Counselors" and "Advisors" in order to lead prospective students into believing that they are qualified to provide academic advice. (*Id.* at ¶¶ 100, 105.) But they are not trained in academic counseling and are instead "financially motivated marketing professionals whose continued employment is contingent on meeting enrollment quotas." (*Id.*) Enrollment counselor managers ("ECMs") are responsible for ensuring that Counselors and Advisors meet their quotas, and ECMs prepare reports for defendant Mueller, who then "instructs ECMs to fire anyone that cannot meet their enrollment targets." (*Id.* at ¶ 106.) "As a result of the enrollment quota system, Counselors and Advisors are pressured by the ECMs, who in turn are pressured by Defendant Mueller, to enroll as many students as possible, even if they believe the student is not qualified or not a good match for the program." (*Id.* at ¶ 108.) Even after students are enrolled, they are assigned service-oriented counselors, who are responsible for maintaining enrollment levels and "are financially motivated to maintain the false impressions as to the University's suitability for a student's career plans left by the recruitment-oriented Counselors and Advisors." (*Id.* at ¶ 109.)

Plaintiff also alleges that "[d]efendants train the Counselors and Advisors [on] how to mislead prospective students, including those in California, to encourage them to enroll and keep them enrolled." (*Id.* at ¶ 112.) For example, "GCE instructs all Counselors and Advisors to avoid communicating with prospective students in writing and to use the telephone at all times," in order "to avoid leaving a written record of their deceptive tactics." (*Id.* at ¶ 115.) Consistent with these instructions, "Counselors and Advisors make affirmative misrepresentations and

omissions to Class members via oral sales pitches and discussions to answer students' questions over the phone." (*Id.* at ¶ 116.) These phone calls are recorded and studied by ECMs so that they can share "the most successful methods for misrepresenting unaccredited programs" with other recruiters. (*Id.*) These tactics include: addressing prospective students' hesitancy with reassurance that the University's program meets the student's needs (even if it does not); talking in broad terms and using psychological motivation to "encourage the student to dream big and start living the future now;" referring to the University's Christian affiliation without volunteering the fact that the University is for-profit; and omitting the fact that a program is not accredited for the purposes of practicing in the student's desired Regulated Profession in that student's state. (*Id.* at ¶ 117–18, 122.) Further, when a prospective student asks if a particular program is accredited, Counselors and Advisors are taught to put potential students at ease by responding, "absolutely, [the University] is fully accredited," and direct them to GCU's published materials which only refer to the University's regional accreditation. (*Id.* at ¶¶ 99, 119.) Defendants provide Counselors and Advisors with other misleading "canned responses" to give prospective students who inquire about accreditation for a Regulated Profession and to put their concerns to rest, including: that they "can work anywhere with a degree from [the University];" that the regional accreditation is an "umbrella accreditation" (thereby suggesting that it encompasses more specific types of accreditation); and that the degree from the University will prepare them to teach in that field or obtain a Ph.D. (*Id.* at ¶ 116.) Counselors and Advisors are also trained to "close a deal with a prospective student to ensure they enroll quickly before they can change their mind or discover truthful information about the school." (*Id.* at ¶ 120.) After a prospective student submits an inquiry, a counselor is assigned to call the prospective student and continue calling two or three times a week (timing those calls based on the counselor's observations of when the prospective student is free to take the call) until enrollment is secured. (*Id.*)

## PROCEDURAL BACKGROUND

Based on the above allegations, plaintiff asserts the following five claims in her FAC: (i) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, against all defendants; (ii) violation of California's False Advertising Law ("FAL"),

1  California Business & Professions Code §§ 17500, *et seq*., against defendants GCU and GCE;

2  (iii) violation of California's Unfair Competition Law ("UCL"), California Business &

3  Professions Code §§ 17200, *et seq*., against defendants GCU and GCE; (iv) violation of

4  California's Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq*.

5  against defendants GCU and GCE; and (v) unjust enrichment against defendants GCU and GCE.

6  (*Id.* at 63, 72–77.)

7      On September 17, 2020, defendants filed a motion to dismiss plaintiff's FAC pursuant to

8  Rules 12(b)(1), 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.  (Doc. No. 24.)

9  Defendants also filed a motion to strike over one hundred paragraphs, or portions thereof, from

10  plaintiff's FAC pursuant to Rule 12(f).  (Doc. No. 25.)  On October 2, 2020, plaintiff filed

11  oppositions to the pending motions.  (Doc. Nos. 29, 30.)  On October 27, 2020, defendants filed

12  their replies thereto.  (Doc. Nos. 33, 34.)

13                              **ANALYSIS**

14  **A.      Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1)**

15          1.      <u>Legal Standard</u>

16      "Federal courts are courts of limited jurisdiction and are presumptively without

17  jurisdiction over civil actions."  *Howard Jarvis Taxpayers Ass'n v. Cal. Secure Choice Ret. Sav.*

18  *Program*, 443 F. Supp. 3d 1152, 1156 (E.D. Cal. 2020) (citing *Kokkonen v. Guardian Life Ins.*

19  *Co.,* 511 U.S. 375, 377 (1994)), *aff'd*, 997 F.3d 848 (9th Cir. 2021).  Federal courts "possess only

20  that power authorized by Constitution and statute, which is not to be expanded by judicial

21  decree."  *Kokkonen*, 511 U.S. at 377 (internal citations omitted).  Subject matter jurisdiction is

22  required; it cannot be forfeited or waived.  *Howard Jarvis Taxpayers Ass'n*, 443 F. Supp. 3d at

23  1156.  Indeed, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the

24  court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

25      Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a party may

26  "challenge a federal court's jurisdiction over the subject matter of the complaint."  *Nat'l Photo*

27  *Grp., LLC v. Allvoices, Inc.*, No. 3:13-cv-03627-JSC, 2014 WL 280391, at *1 (N.D. Cal. Jan. 24,

28  2014).  "A Rule 12(b)(1) jurisdictional attack may be facial or factual.  In a facial attack, the

challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)).  A party making a facial attack does not submit supporting evidence with the motion because jurisdiction is challenged based solely on the pleadings.  *Howard Jarvis Taxpayers Ass'n*, 443 F. Supp. 3d at 1156; *see also Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1084 (N.D. Cal. 2019) ("[C]ourts do not consider evidence outside the pleadings when deciding a facial attack.") (citation omitted). "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): [a]ccepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  The court need not assume the truth of legal conclusions cast in the form of factual allegations. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039.  In ruling on a party's factual attack, district courts "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone*, 373 F.3d at 1039.  The movant may "rely on affidavits or any other evidence properly before the court," and the party opposing the motion must then "present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989) (citing *Thornhill Publ'g Co. v. Gen. Tel. & Elec. Corp.,* 594 F.2d 730, 733 (9th Cir. 1979).

2.      Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction

In her FAC, plaintiff asserts that this court has subject matter jurisdiction over this case pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), and based on federal question jurisdiction, 28 U.S.C. § 1331, because plaintiff brings a federal RICO claim.  (Doc. No. 18 at ¶¶ 21–22.)  In their pending motion to dismiss, defendants do not dispute these bases for this court's subject matter jurisdiction.  Rather, defendants argue that the allegations in the FAC are

insufficient to invoke the court's jurisdiction because:  (1) plaintiff's claims are predicated on

alleged violations of the Higher Education Act ("HEA"), 20 U.S.C. §§ 1001, *et seq.*, which does

not provide for a private right of action to enforce its provisions; (2) plaintiff's claims are barred

by California's "safe harbor doctrine" because defendants made the disclosures required by the

HEA's regulations and cannot be held liable for not making disclosures beyond those required by

the HEA; and (3) the "four essential freedoms" doctrine shields defendant GCU from liability

because plaintiff's claims challenge aspects of GCU's operations and educational decisions,

which are protected essential freedoms of a university and entitled to substantial deference.  (Doc.

No. 24-7 at 15–18.)  The court will address each basis for defendants' subject matter jurisdiction

attack in turn.

                a.      *Whether Plaintiff can Predicate Claims on Alleged Violations of the HEA*

Although the HEA does not provide for a private right of action, *see Parks Sch. of Bus.,*

*Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995), here plaintiff does not bring a claim

directly under the HEA.  (Doc. No. 29 at 28 n. 21.)  Plaintiff does, however, predicate the

unlawful prong of her UCL claim, in part, on alleged violations of the regulations implementing

the HEA.  (Doc. No. 18 at ¶ 263.)  In her opposition to the pending motion to dismiss, plaintiff

emphasizes that the HEA does not expressly prohibit a private right of action, and "[i]t is well

settled that the UCL provides a right to sue even if the 'borrowed' law that makes the conduct

unlawful under the UCL does not contain a private right of action."  (Doc. No. 29 at 28) (citing

*Kumar v. Salov N. Am. Corp.*, No. 4:14-cv-2411-YGR, 2015 WL 457692, *4 (N.D. Cal. Feb. 3,

2015) and *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 114–15 (2014)).  In *Kumar*, the

district court held that the plaintiff had sufficiently pled an unlawful business practice claim under

the UCL that was based in part on her allegations that the defendant's olive oil products were not

labeled in compliance with the country-of-origin requirements of the Tariff Act, for which

Congress had vested exclusive enforcement authority in the U.S. Customs and Border Protection

agency.  *Kumar*, 2015 WL 457692, at *4.  The district court in *Kumar* relied on the Supreme

Court's decision in *Pom Wonderful*, noting that "even if a private plaintiff is not permitted to

enforce a federal statute or regulation directly, the federal law may form the predicate for a

private right of action under another federal or state law where the federal law does not expressly prohibit such an action." *Id.* (citing *POM Wonderful LLC*, 573 U.S. at 114). There, although Congress had vested enforcement authority to a specific federal agency, the defendant had not offered any "authority that the Tariff Act expressly prohibits any action based on its provisions under federal or state consumer protection laws." *Id.* Similarly, here, in moving to dismiss plaintiff's cause of action defendants rely on the fact "[t]here is no express right of action under the HEA except for suits brought by or against the Secretary of Education." (Doc. No. 24-7 at 16) (citing *Parks Sch. of Bus., Inc*, 51 F.3d at 1484; 20 U.S.C. § 1082(a)(2)). But, that provision does not expressly prohibit a plaintiff from predicating state consumer law claims on alleged violations of the HEA and its regulations.

Moreover, none of the cases cited by defendants in support of their argument that plaintiff's claims are preempted by the HEA are applicable here. For example, defendants cite the decisions in *United States v. Gorski*, No. 2:11-cv-4252-AG, 2012 WL 12886823 (C.D. Cal. Mar. 22, 2012) and *Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010) for the broad proposition that "[t]he Ninth Circuit has firmly established that state law claims for purported violations of the UCL, CLRA, and fraudulent and deceptive practices are preempted by the HEA." (Doc. No. 33 at 21.) But neither of those cases stand for such a sweeping proposition. Rather, both of those decisions dealt with a different provision of the HEA, which is expressly applicable to the Federal Family Education Loan Program ("FFELP") that Congress created to encourage lenders to loan money to students and their parents on favorable terms, and which provides that "[l]oans made, insured, or guaranteed pursuant to [FFELP] shall not be subject to any disclosure requirements of any State law." 20 U.S.C. § 1098(g); *see also Chae*, 593 F.3d at 942 (concluding "that 20 U.S.C. § 1098(g) applies to, and thus precludes, several of the plaintiffs' state law claims" regarding the defendant's loan billing statement practices); *Gorski*, 2012 WL 12886823, at *7 (citing § 1098(g) and noting that the HEA "expressly preempts state law disclosure requirements related to student loans"). That provision of the HEA requiring certain disclosures in connection with FFELP is not at issue in this case. In addition, defendants' citation to the decision in *Virgen v. Mae* is unavailing because in that case, the district court dismissed a claim brought directly under the

14

1   HEA, and as noted, plaintiff does not bring a direct HEA claim in this action.  *Virgen v. Mae*, No.

2   2:06-cv-0341-FCD-DAD, 2006 WL 3781847, at *2 (E.D. Cal. Dec. 21, 2006) (dismissing a claim

3   brought directly under the HEA with prejudice).

4          For these reasons, the court is not persuaded by defendants' unsupported argument that

5   the HEA preempts plaintiff's claims brought in this action or precludes plaintiff from predicating

6   her state consumer protection law claims on alleged violations of the HEA.

7                  b.     *Whether California's "Safe Harbor Doctrine" Bars Plaintiff's Claims*

8          Next, defendants argue that plaintiff's claims are barred by California's "safe harbor

9   doctrine," in which a defendant is shielded from liability by a "safe harbor" that is created when

10   "the [California] Legislature permits certain conduct or considered a situation and concluded no

11   action should lie."  (Doc. No. 24-7 at 16) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel.

12   *Co.*, 20 Cal. 4th 163, 182 (1999)); *see also Pom Wonderful LLC v. Coca Cola Co.*, No. 2:08-cv-

13   06237-SJO-FMO, 2013 WL 543361, at *5 (C.D. Cal. Feb. 13, 2013) (noting that the safe harbor

14   doctrine "applies equally to actions by the California legislature and actions by the U.S.

15   Congress") (citing *Davis v. HSBC Bank Nev., N.A.,* 691 F.3d 1152, 1164 (9th Cir. 2012)).

16   Defendants contend that GCU is subject to the HEA's regulations and "rules for disclosures to

17   prospective students," specifically the disclosures described in 34 C.F.R. § 668.6(b).  (Doc. No.

18   24-7 at 17.)  According to defendants, because GCU makes those requisite disclosures to

19   prospective students, the HEA's safe harbor precludes plaintiff's claims that GCU "must make

20   additional disclosures specific to her educational and California-licensure goals."  (*Id.*)

21          In support of their argument, defendants rely on a decision by the district court in *Barber

22   *v. Nestle USA, Inc.*, 154 F. Supp. 3d 954, 962 (C.D. Cal. 2015), *aff'd*, 730 F. App'x 464 (9th Cir.

23   2018), in which the court concluded that a safe harbor created by California's Transparency in

24   Supply Chains Act of 2010 precluded the plaintiffs' UCL, CLRA, and FAL claims, which were

25   based on the defendant's failure to make additional disclosures—beyond those required by the

26   Act—to inform consumers that some proportion of its cat food products may include seafood that

27   was sourced from forced labor.  There, the district court was "persuaded that the California

28   Legislature considered the situation of regulating disclosure by companies with possible forced

                                                15

1    labor in their supply lines and determined that only the limited disclosure mandated by [the

2    Supply Chains Act, Cal. Civ. Code] § 1714.43 is required."  *Barber*, 154 F. Supp. 3d at 961–62.

3    The court also noted that "[p]laintiffs may wish—understandably—that the Legislature had

4    required disclosures beyond the minimal ones required by § 1714.43, [b]ut that is precisely the

5    sort of legislative second-guessing that the safe harbor doctrine guards against."  *Id.*  Importantly,

6    the district court in *Barber* emphasized that the plaintiffs had not alleged in their complaint that

7    the defendant had failed to comply with the disclosure requirements of the Supply Chains Act;

8    indeed, the plaintiffs in that case did not dispute that defendant had complied with the Act's

9    disclosure requirements, they simply wanted to impose additional requirements as well.  *Id.* at

10   959.

11        The court does not find defendants' reliance on the decision in *Barber* to be persuasive.

12   In contrast to *Barber*, here defendants merely assert that GCU made the disclosures described in

13   34 C.F.R. § 668.6(b) to plaintiff and refer the court to three exhibits attached to the declaration of

14   Kathleen Hall, a paralegal at GCU:  plaintiff's Application for Admission, plaintiff's Enrollment

15   Agreement, and GCU's 2017–2018 Academic Catalog.  (Doc. Nos. 24-7 at 17; 33 at 12.)  In

16   doing so, defendants refer to over 400 pages worth of material without the aid of any pincites, so

17   it is unclear to the court how these exhibits purportedly support their assertion that GCU made the

18   requisite disclosures to plaintiff.

19        Moreover, defendants contend that because plaintiff alleges in her FAC that GCU had

20   disclosed to her that it has regional accreditation, that means she does not contest that GCU made

21   the requisite disclosures.  (Doc. No. 33 at 13.)  However, the court is unpersuaded that this sole

22   disclosure regarding regional accreditation necessarily creates a safe harbor precluding plaintiff

23   from bringing claims based on defendants' alleged failure to make other disclosures (e.g.,

24   disclosures regarding the Program's suitability for professional licensure).  Notably, the

25   referenced regulation—34 C.F.R. § 668.6—does not mention "regional accreditation" at all, let

26   alone require disclosures regarding regional accreditation specifically but not other types of

27   accreditation or licensure.  *See* 34 C.F.R. § 668.6 (effective: July 1, 2015 to June 30, 2020).

28   Without any such disclosure requirement for certain types of accreditation and not others, 34

C.F.R. § 668.6 provides no basis upon which to conclude or infer that a safe harbor exists for institutions that disclose only its regional accreditation.  Rather, that regulation sets forth various required disclosures for each program offered by an institution pertaining to on-time graduation rates, tuition and fees, typical costs for books and supplies, room and board costs, and placement rate for students completing the program.  *Id.*  Plaintiff argues that regardless of whether defendants "purportedly complied with unrelated regulations prescribing other general disclosures," defendants can still be required "to make additional disclosures on which the regulations are silent."  (Doc. No. 29 at 30.)  Indeed, there is nothing in the text of § 668.6 suggesting that Congress created a safe harbor precluding claims based on allegedly false and misleading statements or omissions to prospective students about an institution's accreditations and its programs' suitability for licensure.  Furthermore, unlike in *Barber*, where the district court concluded that "California considered the very problem Plaintiffs identify" (informing consumers about possible forced labor in supply chains) and addressed that problem by mandating only a limited set of disclosures, here defendants have not even attempted to argue that Congress has considered the possibility that institutions would mislead prospective students regarding a program's accreditation and suitability for professional licensure and affirmatively decided that "no action should lie" in that situation.  *See Cel-Tech Commc'ns, Inc.*, 20 Cal. 4th at 182.

Accordingly, the court rejects defendants' argument that plaintiff's claims are barred by the safe harbor doctrine and will deny the motion to dismiss to the extent based upon that argument.

c.     *Whether GCU is Entitled to Deference in Exercising its "Four Essential Freedoms"*

Defendants also argue that plaintiff improperly challenges GCU's essential freedoms as a university because she alleges that GCU admits nearly every student who applies, GCU does not hire quality faculty, GCU offers inferior online programs, and GCU teaches subjects that purportedly do not lead to professional licensure.  (Doc. No. 24-7 at 18.)  Defendants contend that these aspects of GCU's operations and its educational decisions are entitled to substantial deference.  (*Id.*)  In support, defendants quote from two leading U.S. Supreme Court decisions

17

1    involving affirmative action in university admissions to purportedly show that the Supreme Court

2    has recognized "'the four essential freedoms' of a university—to determine for itself on academic

3    grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to

4    study," *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978), and that courts defer to the

5    "complex educational judgments in [] area[s] that lie[] primarily within the university's

6    expertise," *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003).  (Doc. No. 24-7 at 17.)  Merely

7    quoting from these decisions, however, does advance defendants' argument made in the context

8    of this case.  Notably, defendants do not point to any cases in which a federal court has concluded

9    that it lacked subject matter jurisdiction over allegations of fraud by a university based on

10    deference to that university's four essential freedoms.  Moreover, as plaintiff has emphasized in

11    her opposition brief, "this case is not about any of those 'freedoms,'"—plaintiff "does not seek to

12    intervene in academic decisions, but rather, to enjoin the false advertising and fraudulent scheme

13    that leads students to believe that their programs are adequate for professional licensure."  (Doc.

14    No. 29 at 30.)  Defendants do not address their "four essential freedoms" argument in their reply

15    brief, apparently conceding that attacking this court's jurisdiction on this basis lacks merit.

16           Accordingly, the court concludes that the Supreme Court's recognition of a university's

17    "four essential freedoms" has no bearing whatsoever on whether this court has subject matter

18    jurisdiction over plaintiff's claims brought in this action.  In light of this conclusion, the court will

19    deny defendants' motion to dismiss this action for lack of subject matter jurisdiction.

20    **B.**    **Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2)**

21           1.    <u>Legal Standard</u>

22           Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move to

23    dismiss an action for lack of personal jurisdiction.  In opposing such a motion, the plaintiff bears

24    the burden of proof to show that jurisdiction is appropriate.  *Picot v. Weston*, 780 F.3d 1206, 1211

25    (9th Cir. 2015); *Love v. Assoc. Newspapers, Ltd.*, 611 F.3d 601, 608 (9th Cir. 2010).  When a

26    defendant's motion to dismiss is based on written materials rather than an evidentiary hearing and

27    is to be decided on the pleadings, affidavits, and discovery materials, the plaintiff need only make

28    a *prima facie* showing that personal jurisdiction exists in order for the action to proceed.  *See*

1   *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015); *Picot*, 870 F.3d at 1211.

2   In determining whether a plaintiff has established personal jurisdiction, the court accepts

3   the plaintiff's allegations as true and resolves any conflicts between the parties over statements

4   contained in affidavits in the plaintiff's favor.  *Love*, 611 F.3d at 608; *Schwarzenegger v. Fred*

5   *Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).  However, where allegations are

6   controverted by a defendant, the plaintiff cannot "simply rest on the bare allegations of [the]

7   complaint, but rather [is] obligated to come forward with facts, by affidavit or otherwise,

8   supporting personal jurisdiction."  *Philips v. Pitt Cnty. Mem'l Hosp., Inc.*, 855 F. App'x 324 (9th

9   Cir. 2021)[3] (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)).

10   "Where, as here, there is no applicable federal statute governing personal jurisdiction, the

11   law of the state in which the district court sits applies."  *Core-Vent Corp. v. Nobel Indus. AB*, 11

12   F.3d 1482, 1484 (9th Cir. 1993).  "California's long-arm statute allows courts to exercise personal

13   jurisdiction over defendants to the extent permitted by the Due Process Clause of the United

14   States Constitution."  *Core-Vent Corp.*, 11 F.3d at 1484; *see also* Cal. Civ. Proc. Code § 410.10

15   ("A court of this state may exercise jurisdiction on any basis not inconsistent with the

16   Constitution of this state or of the United States.").  Thus, only constitutional principles constrain

17   the jurisdiction of a federal court in California.  *Love*, 611 F.3d at 608–09.

18   Under the Fourteenth Amendment's Due Process Clause, courts may exercise personal

19   jurisdiction over non-resident defendants only so long as there are sufficient "minimum contacts"

20   between the defendant and the forum state "such that the maintenance of the suit does not offend

21   'traditional notions of fair play and substantial justice.'"  *World-Wide Volkswagen Corp. v.*

22   *Woodson*, 444 U.S. 286, 292 (1980) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

23   (1945)).  "Each defendant's contacts with the forum State must be assessed individually."  *Calder*

24   /////

25   /////

26   /////

27   _____

28   [3]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule
36-3(b).

*v. Jones*, 465 U.S. 783, 790 (1984).[4]  "The strength of contacts required depends on which of the two categories of personal jurisdiction a litigant invokes:  specific jurisdiction or general jurisdiction."  *Ranza*, 793 F.3d at 1068.  Here, plaintiff asserts that this court has personal jurisdiction over the defendants based only on specific jurisdiction.  (Doc. No. 29 at 11–14.)

In determining whether a court has specific jurisdiction over a non-resident defendant, the following three-prong test is to be employed:

> (1)  The non-resident defendant must *purposefully direct* his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he *purposefully avails* himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2)  the claim must be one which *arises out of* or *relates to* the defendant's forum-related activities; and
>
> (3)  the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be *reasonable*.

*Picot*, 780 F.3d at 1211 (citing *Fred Martin Motor Co.*, 374 F.3d at 802) (emphasis added).  Plaintiff has the burden of establishing the first two of these prongs, and a "strong showing on one axis will permit a lesser showing on the other."  *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1210 (9th Cir. 2006) (*en banc*).  If plaintiff meets this burden, the burden then shifts to defendant on the third prong to show that the exercise of jurisdiction would not be reasonable.  *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011).

/////

/////

/////

/////

/////

---

[4]  A plaintiff must also establish personal jurisdiction for "each claim asserted against a defendant."  *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).  If personal jurisdiction exists over one claim, but not others, the district court may exercise pendent personal jurisdiction over any remaining claims that arise out of the same "common nucleus of operative facts" as the claim for which jurisdiction exists.  *Id.*

a.  *Purposeful Direction of Activities*[5]

"Where allegedly tortious conduct takes place outside the forum and has effects inside the forum," courts in the Ninth Circuit examine purposeful direction by using the three-part "effects" test set forth by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984).  *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1208 (9th Cir. 2020), *cert. denied*, No. 20-1430, ––– U.S. –––, 2021 WL 4507661 (U.S. Oct. 4, 2021).  This "*Calder* effects test" asks whether the defendant is alleged to have (1) committed an intentional act (2) that was expressly aimed at the forum state and (3) that caused harm the defendant knew was likely to be suffered in the forum state.  *Fred Martin Motor Co.*, 374 F.3d at 803.  To satisfy the intentional act requirement, a plaintiff's allegations must refer to a defendant's "intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act."  *Id.* at 805–07.  Whether allegations are sufficient to satisfy the express aiming requirement depends on the specific type of tort or other wrongful conduct at issue.  *Id.*; *see also Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012).  The focus of the express aiming requirement is on the "defendant's contacts with the forum state itself, not the defendant's contacts with the persons who reside there."  *Walden v. Fiore*, 571 U.S. 277, 285 (2014).  The express aiming requirement is not satisfied merely "by a defendant's knowledge that harm may be inflicted on a plaintiff in a particular forum."  *AMA Multimedia, LLC*, 970 F.3d at 1209, n.5.  (citing *Axiom*, 874 F.3d at 1068–70; *Walden*, 571 U.S. at 286).  As for the sufficiency of allegations of harm, "'something more' than mere foreseeability" is required.  *Fred Martin Motor Co.*, 374 F.3d at 804–05 (quoting

---

[5]  The analysis under this first prong of the three-step inquiry differs depending on whether the action involves allegations of tortious conduct or contract obligations.  *See Ziegler v. Indian River Country*, 64 F.3d 470, 473 (9th Cir. 1995); *Sinatra*, 854 F.2d at 1195.  A "purposeful availment" analysis is typically applied in suits sounding in contract, and a "purposeful direction" analysis is typically applied in suits sounding in tort.  *See Fred Martin Motor Co.*, 374 F.3d at 802.  Because plaintiff's consumer protection and RICO claims in this action sound in tort, the court will apply the purposeful direction analysis.  *See Maeda v. Pinnacle Foods Inc.*, 390 F. Supp. 3d 1231, 1241, 1245 (D. Haw. 2019) (applying the purposeful direction test where the plaintiff asserted CLRA, UCL, FAL, and unjust enrichment claims); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 1027 (N.D. Cal. 2018) ("Because the RICO and fraud-on-consumer claims are all predicated on torts, a purposeful direction analysis applies instead of a purposeful availment analysis.").

1    *Bancroft & Masters*, 223 F.3d 1082, 1087 (9th Cir. 2000)).  An action taken outside the forum

2    state with foreseeable effects within the forum state does not *per se* give rise to specific personal

3    jurisdiction.  *Id.*  As the Supreme Court has made clear, "mere injury to a forum resident is not a

4    sufficient connection to the forum.  Regardless of where a plaintiff lives or works, an injury is

5    jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the

6    forum State."  *Walden*, 571 U.S. at 290.  Accordingly, "[t]he proper question is not where the

7    plaintiff experienced a particular injury or effect but whether the defendant's conduct connects

8    him to the forum in a meaningful way."  *Id.*

9                            *b.*      *Claim Arises out of or Relates to Forum-Related Activities*

10           To satisfy the second prong, plaintiffs must show that their claims arise out of or relate to

11   the non-resident defendant's forum-related activities.  *Bristol-Myers Squibb Co. v. Superior Ct. of*

12   *California, San Francisco Cty.*, ⸺ U.S. ⸺, 137 S. Ct. 1773, 1780 (2017); *Picot*, 780 F.3d at

13   1211.  The Supreme Court recently provided the following guidance with regard to this prong:

14                   The first half of that standard asks about causation; but the back
                     half, after the "or," contemplates that some relationships will
15                   support jurisdiction without a causal showing.  That does not mean
                     anything goes.  In the sphere of specific jurisdiction, the phrase
16                   'relate to' incorporates real limits, as it must to adequately protect
                     defendants foreign to a forum.  But again, we have never framed
17                   the specific jurisdiction inquiry as always requiring proof of
                     causation—i.e., proof that the plaintiff's claim came about because
18                   of the defendant's in-state conduct.

19   *Ford Motor Co. v. Montana Eighth Judicial District Court*, ⸺ U.S. ⸺, 141 S. Ct. 1017, 1026

20   (2021) ("*Ford Motor*").[6]  In other words, "although the plaintiff's claims must arise out of or

21   relate to the defendant's contacts with the forum, a strict causal relationship between the

22

23   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [6]  Before the Supreme Court's decision *Ford Motor*, courts in the Ninth Circuit required a
     showing of but-for causation, i.e., but for defendant's alleged contacts and activities, plaintiff's
24   cause of action would not have arisen.  *Talavera Hair Prods., Inc. v. Taizhou Yunsung Elec.*
     *Appliance Co.*, No. 3:18-cv-823-JLS-JLB, 2021 WL 3493094, at *10 (S.D. Cal. Aug. 6, 2021)
25   ("[C]ourts within the Ninth Circuit have traditionally applied a 'but for' test to determine whether
     a claim 'arises out of or relates to' a defendant's contacts with a forum."); *Clarke v. Dutton*
26   *Harris & Co., PLLC*, No. 2:20-cv-00160-JAD-BNW, 2021 WL 1225881, at *4 (D. Nev. Mar. 31,
     2021) ("Historically, courts in the Ninth Circuit exclusively relied on a 'but for' test to determine
27   whether a particular claim arises out of forum-related activities.  But the Supreme Court appears
     to have recently done away with that approach in [*Ford Motor*].").
28

1   defendant's activities in the forum and the harm is not required." *Wesch v. Yodlee, Inc.*, No. 3:20-

2   cv-05991-SK, 2021 WL 3486128, at *5 (N.D. Cal. Aug. 5, 2021) (citing *Ford Motor*, 141 S. Ct.

3   at 1025-26).  Rather, "there must be 'an affiliation between the forum and the underlying

4   controversy, principally, [an] activity or an occurrence that takes place in the forum State and is

5   therefore subject to the State's regulation.'"  *Ford Motor*, 141 S. Ct. at 1025 (quoting *Bristol-*

6   *Myers Squibb*, 137 S. Ct. at 1780).

7           2.      Defendants' Motion to Dismiss for Lack of Personal Jurisdiction

8           As an initial matter, plaintiff argues in her opposition to the pending motion that

9   defendants are judicially estopped[7] from contesting personal jurisdiction in this case.  (Doc. No.

10  29 at 14–15.)  Plaintiff notes that the corporate defendants did not contest that a federal court in

11  Georgia had personal jurisdiction over them in two class action lawsuits brought by Georgian

12  students asserting similar fraud and RICO claims.  (*Id.*) (citing *Carr v. Grand Canyon Univ., Inc.*,

13  No. 1:19-cv-01707-TCB, Order, Doc. No. 24 at 5–6 (N.D. Ga. Aug. 19, 2019); *Austin v. Grand*

14  *Canyon Univ., Inc.*, No. 1:19-cv-03734-SCJ, Order, Doc. No. 33 at 11 (N.D. Ga. May 11, 2020)).

15  Plaintiff emphasizes that in both of those other cases, the corporate defendants argued that

16  personal jurisdiction was lacking as to the non-Georgian plaintiffs, whose claims were unrelated

17  to Georgia, but the corporate defendants had not argued that personal jurisdiction was lacking as

18  to the claims brought by the Georgian plaintiffs who enrolled in graduate programs while in

19  Georgia.  (*Id.*)  Agreeing with the corporate defendants' arguments in those cases, the district

20  court in Georgia dismissed the non-Georgian plaintiffs' claims for lack of personal jurisdiction.

21  (*See id.*)  According to plaintiff, because she is a citizen of California and she enrolled in the

22  Program while in California, all defendants (not just the corporate defendants) should be

23  judicially estopped from moving to dismiss her claims for lack of personal jurisdiction—a

24  _____

25  [7] "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by
    asserting one position, and then later seeking an advantage by taking a clearly inconsistent

26  position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).  In
    determining whether the doctrine of judicial estoppel applies, courts consider whether a party's

27  later position is clearly inconsistent with its earlier position; whether the court in the earlier
    lawsuit accepted that position; and whether the party asserting an inconsistent position would

28  derive unfair advantage or impose unfair detriment on the opposing party if not estopped.  *Id.*

1  position that plaintiff argues is clearly inconsistent with the position that the corporate defendants

2  had taken in *Carr* and *Austin*.  (*Id.* at 15.)

3      In reply, defendants counter that judicial estoppel does not apply because there is no

4  inconsistency in the positions they have taken.  (Doc. No. 33 at 11.)  As for the individual

5  defendants Mueller, Bachus, and Meyer, they were not parties in *Carr* and *Austin* and thus took

6  no position whatsoever.  (*Id.*)  As for the corporate defendants, according to counsel, they "did

7  not argue in *Carr* or *Austin* that personal jurisdiction was proper as to the forum plaintiff, but

8  rather that it was improper as to the foreign plaintiffs whose claims did not arise from the

9  defendants' alleged forum contacts."  (*Id.*)  According to defendants, that position is not "clearly

10  inconsistent" with their "current position that plaintiff's claims do not arise from defendants'

11  alleged contacts with this forum."  (*Id.*)

12      The court agrees that judicial estoppel does not apply here.  Plaintiff has provided no basis

13  on which to find that the individual defendants are judicially estopped from moving to dismiss

14  plaintiff's claims brought against them for lack of personal jurisdiction.  The court has also

15  reviewed the district court's orders in *Carr* and *Austin* and finds no clear inconsistency in the

16  position the corporate defendants took in those cases and the position they now take in this case.

17  *See Austin v. Grand Canyon Univ., Inc.*, No. 1:19-cv-03734-SCJ, Order, Doc. No. 33 at 11 (N.D.

18  Ga. May 11, 2020) (noting that "defendants *do not appear* to dispute that they are subject to

19  specific jurisdiction for [Georgian plaintiff] Austin's claims") (emphasis added).  Accordingly,

20  the court concludes that the corporate defendants are not judicially estopped from asserting that

21  this court lacks personal jurisdiction over them in this case.  *See New Hampshire v. Maine*, 532

22  U.S. 742, 750 (2001) (holding that for the doctrine of judicial estoppel to apply, "a party's later

23  position must be clearly inconsistent with its earlier position").

24      The court now turns to the merits of defendants' motion to dismiss for lack of personal

25  jurisdiction.  Defendants argue that this court lacks specific personal jurisdiction over each of

26  them because "[p]laintiff does not allege that any defendant took any actions *in California*, or

27  specifically *targeted her or other Californians*, independently, and plaintiff's claims do not arise

28  from defendants' conduct *in California*."  (Doc. No. 24-7 at 21.)  Defendants also argue that

24

1    plaintiff's "general allegations concerning defendants' collective conduct does not support

2    specific personal jurisdiction" because each defendant's contacts must be examined individually.

3    (*Id.* at 20.)  According to defendants, plaintiff's FAC does not include any allegations that the

4    individual defendants Mueller, Bachus, and Meyer engaged in any conduct expressly aimed at

5    California.  (*Id.* at 21.)  As for the corporate defendants GCU and GCE, defendants argue that

6    plaintiff's jurisdictional allegations merely identify GCU's nationwide marketing efforts (in

7    California and every other state) and are thus insufficient to make a *prima facie* showing that

8    personal jurisdiction exists in this forum.  (*Id.* at 20.)

9         In her opposition to the pending motion, plaintiff does not address defendants' arguments

10   as to the purported deficiencies with her jurisdictional allegations.  Rather, plaintiff asserts that

11   she has met her burden because she alleges that "[d]efendants committed an intentional act of

12   designing a fraudulent recruiting scheme, designed to omit material information regarding its

13   professional accreditation," and "[d]efendants intentionally aimed that scheme towards the

14   consumers and markets within California, and in particular, expressly created the University's

15   online program because they intended to reach graduate students around the country, including

16   California." (Doc. No. 29 at 12.)  Plaintiff also asserts that her enrollment in the Program was a

17   result of defendants' robust marketing efforts directed at students in California and throughout the

18   country.  (*Id.*)

19        The court notes that in making these assertions, plaintiff refers to the defendants

20   collectively, without identifying any allegations that pertain to each defendant individually.  This

21   is despite the fact that plaintiff bears the burden to show that each defendant purposefully directed

22   activities to California and that each of her claims brought against that defendant arise out of or

23   relate to that particular defendant's California-related activities.  *See Picot*, 780 F.3d at 1211.

24   Highlighting this burden, defendants have argued in their motion that plaintiff's general

25   allegations, which refer to "defendants" in the collective, are inadequate to establish personal

26   jurisdiction as to each defendant individually, as is required.  (Doc. No. 24-7 at 20–21.)  The

27   court agrees.

28   /////

1    Using "defendants" in the collective, plaintiff alleges the following with regard to

2    personal jurisdiction:  "the injuries, damages, and/or harm upon which this action is based,

3    occurred, or arose out of activities engaged in by Defendants that were knowingly and

4    intentionally directed towards consumers in the state of California and around the nation," and

5    "[d]efendants have sufficient minimum contacts with California and intentionally avail

6    themselves of the consumers and markets within California through the promotion, marketing,

7    and sale of educational programs to tens of thousands of citizens in California."  (Doc. No. 18 at

8    ¶¶ 24–25).  But these allegations alone are insufficient to establish a *prima facie* showing of

9    personal jurisdiction for each defendant whose contacts must be examined individually.  *See*

10   *Calder*, 465 U.S. at 790.

11           *a.    Individual Defendants*

12   Plaintiff bears the burden to show that each of the individual defendants purposefully

13   directed their activities to California and that plaintiff's RICO claim (the only claim brought

14   against the individual defendants) arises from or relates to those California-related activities.

15   As for defendant Meyer, plaintiff alleges that as GCE's chief operating officer, defendant

16   Meyer "directs and oversees the fraud and racketeering enterprise" (*id.* at ¶ 11), "direct[s],

17   control[s], and participate[s] in each of the activities of the enterprise . . . [and] oversee[s] the

18   day-to-day management of the activities" (*id.* at ¶ 233), "oversees [Counselors' and Advisors']

19   presence in California using interstate wires" (*id.* at ¶ 143), and "supervised Mr. Granitz" in

20   accordance with the policies and procedures for incentivizing Counselors and Advisors to enroll

21   students (*id.* at ¶ 174).  Those are the only allegations specific to defendant Meyer appearing in

22   the FAC.  Although those allegations may mirror the requisite elements for pleading a RICO

23   claim, they fall short of describing any intentional conduct or contacts by defendant Meyer that he

24   has expressly aimed at California.  Absent allegations of forum-related activities by defendant

25   Meyer, it follows that plaintiff has also not alleged that her RICO claim arises from or relates to

26   any such activities by him.  Thus, the court concludes that plaintiff has not alleged facts sufficient

27   to make a *prima facie* showing that personal jurisdiction exists in order for this action to proceed

28   against defendant Meyer.

As for defendant Bachus, plaintiff alleges that as GCE's chief financial officer, defendant Bachus "directs and oversees the fraud and racketeering enterprise" (*id.* at ¶ 10); "ensures that the Counselors and Advisors, including those in California, are compensated for their work on behalf of the Defendants" (*id.* at ¶ 143); "approves and oversees their compensation, which is paid by GCE in Arizona to Counselors and Advisors in California using interstate wires" (*id.*); paid Mr. Granitz in accordance with the policies and procedures for incentivizing Counselors and Advisors to enroll students (*id.* at ¶ 174); and "control[s] and participate[s] in the activities of the enterprise," including those "undertaken to transfer monies, such as compensating the [Counselors and Advisors] and other Defendants, facilitating the receipt of funds from the federal student loan program, and transferring funds away from the University and Grand Canyon and into GCE" (*id.* at ¶ 232).  Here too, plaintiff's allegations may track the requisite elements of her RICO claim, but plaintiff has not alleged that defendant Bachus engaged in any intentional conduct or contacts expressly aimed at California such that plaintiff's RICO claim may be found to arise out of or relate to such forum-related activities.  Accordingly, the court concludes that plaintiff has also failed to allege facts sufficient to make a *prima facie* showing that personal jurisdiction exists in order for this action to proceed against defendant Bachus.

As for defendant Mueller, the president of the Foundation, president of GCU, and chief executive officer of GCE, plaintiff alleges that defendant Mueller "directs and oversees the fraud and racketeering enterprise" (*id.* at ¶¶ 9, 35); pressures ECMs who in turn pressure Counselors and Advisors "to enroll as many students as possible, even if they believe the student is not qualified or not a good match for the program" (*id.* at ¶¶ 107–08); "instructs ECMs to fire anyone that cannot meet their enrollment targets" (*id.* at ¶ 106); directs and oversees employees who make "misleading marketing calls to prospective students in California using interstate wires" as part of GCE and GCU's recruiting efforts (*id.* at ¶¶ 140–43); and "supervised Mr. Granitz" and directed his efforts to recruit plaintiff using interstate phone calls in accordance with the policies and procedures for incentivizing Counselors and Advisors to enroll students (*id.* at ¶¶ 174–75).  At bottom, plaintiff appears to suggest that her RICO claim brought against defendant Mueller arises from or relates to his intentional act of directing and overseeing a nationwide recruitment

1  and marketing program, through which hundreds of recruiters make allegedly misleading

2  marketing calls to prospective students throughout the country, including California, and that Mr.

3  Granitz—the specific recruiter who allegedly misled plaintiff during telephone conversations—

4  did so "under the direction and oversight of GCE and defendant Mueller." (*Id.* at ¶ 175). While

5  these allegations may suffice to show, if proven, that defendant Mueller committed an intentional

6  act (overseeing and directing GCE's marketing efforts by enforcing enrollment quotas and

7  incentivizing recruiters), plaintiff's allegations explicitly state that these efforts are part of a

8  nationwide marketing program to recruit prospective students throughout the country, not one

9  specifically targeting California. Moreover, plaintiff does not allege any conduct by defendant

10 Mueller that was expressly aimed at California. Thus, plaintiff's allegations fall short of

11 satisfying the "express aiming" requirement, which focuses on defendant Mueller's "contacts

12 with the forum state itself." *See Walden*, 571 U.S. at 285. Accordingly, the court concludes that

13 plaintiff has also failed to allege facts sufficient to make a *prima facie* showing that personal

14 jurisdiction exists in order for this action to proceed against defendant Mueller.

15                          *b.*      *Corporate Defendants*

16           Plaintiff bears the burden to show that defendants GCU and GCE each purposefully

17 directed their activities to California and that her claims arise from or relate to those California-

18 related activities. In support of their pending motion to dismiss, defendants point to the

19 declaration by Ms. Hall that "[n]either GCU nor GCE operates any physical office or campus

20 location in California," and that GCU and GCE have their principal places of business in Phoenix,

21 Arizona, employing a total of more than 8,700 persons in Arizona. (Doc. No. 24-1 at ¶¶ 16–19.)

22           As for defendant GCU, plaintiff alleges in her FAC that GCU provides academic

23 instruction; receives "tuition dollars, obtained by students, including those in California, from the

24 federal student loan program;" and then "pay[s] GCE those tuition dollars to perform various

25 services, including most importantly, conducting the marketing and recruiting of new students

26 from around the country, including California, to enroll." (Doc. No. 18 at ¶ 64.) Plaintiff further

27 alleges that "while [GCU] is the federally-approved institution to receive student loan monies, all

28 of the contact with students is handled by GCE employees." (*Id.* at ¶ 129.) Assuming that these

allegations are true, as the court must since defendants have not controverted them, these allegations actually undercut plaintiff's contention that personal jurisdiction exists over GCU in this case.  Plaintiff does not allege that she had any contacts with GCU employees, let alone that any such GCU contacts were expressly aimed at California and gave rise to or relate to her claims.  Accordingly, the court concludes that plaintiff has failed to allege facts sufficient to make a *prima facie* showing that personal jurisdiction exists in order for this action to proceed against defendant GCU.

        As for defendant GCE, plaintiff's allegations present a slightly closer call.  In addition to describing GCE's allegedly misleading marketing program, plaintiff also alleges that according to LinkedIn, "GCE employ dozens of Counselors and Advisors, as well as at least one 'Marketing Host,' in California," and "GCE maintains a 'Call Center Specialist' based in California."  (*Id.* at ¶ 140.)  Referring to others who hold themselves out as having positions with "Grand Canyon University," which previously was the trade name of GCE, plaintiff also speculates that the number of GCE Counselors and Advisors based in California is likely "considerably larger than the dozens that are identifiable from LinkedIn."  (*Id.*)  Whether these somewhat speculative allegations would be sufficient to establish general personal jurisdiction or purposeful availment notwithstanding (an argument that plaintiff does not advance), there is certainly no connection alleged by plaintiff between GCE's supposed employment of some California-based employees and plaintiff's claims brought in this action.  Plaintiff alleges that when GCE counselor Mr. Granitz placed calls to her in California, he was either based in Arizona or Indiana, and that GCE counselor Ms. Landa was in Arizona when she called plaintiff.  (*Id.* at 175.)  In their pending motion to dismiss, defendants acknowledge that "[p]laintiff's claims arise from what was purportedly said during telephone calls with the counselors in Arizona or Indiana."  (Doc. No. 33 at 9.)  Thus, there is no dispute that the contacts giving rise to plaintiff's claims did not arise from or relate to any of the allegedly California-based employees of GCE.

        In support of her argument that this court has personal jurisdiction over GCE and GCU, plaintiff relies exclusively on a decision from a district court in Ohio that found it had personal jurisdiction over GCE and GCU under Ohio's long-arm statute because GCE and GCU had

1    caused injury in Ohio and had purposefully availed themselves of the benefits of doing business

2    in Ohio.  (Doc. No. 29 at 13–14) (citing *Perrow v. Grand Canyon Educ., Inc.*, No. 2:09-cv-670,

3    2010 WL 271298, at *4 (S.D. Ohio Jan. 15, 2010)).  In *Perrow*, a student sued GCE and GCU

4    alleging claims for negligence, fraudulent inducement, and unjust enrichment because GCU had

5    informed her that the program she had completed was the incorrect program to become a certified

6    teacher in Ohio, and that she needed to enroll in the correct two-year program instead, at her own

7    expense, which she then did.  2010 WL 271298, at * 1.  Although the facts in *Perrow* may seem

8    somewhat similar to the facts alleged in this case, that district court's analysis of personal

9    jurisdiction has little persuasive value here.  As defendants note in their reply (Doc. No. 33 at 10

10   n.3), the court in *Perrow* analyzed jurisdiction under Ohio's long-arm statute, which has

11   materially different requirements for establishing personal jurisdiction, and in part, mirrors the

12   purposeful availment test that is used for breach of contract claims—not the *Calder* effects test

13   for purposeful direction used for tort claims.  2010 WL 271298, at * 2–5.  Under the Ohio statute,

14   the district court in *Perrow* was required to find that "(1) an act or omission outside the state

15   caused tortious injury in Ohio, and (2) the defendant regularly conducted activity in Ohio."  *Id.*

16   Most importantly, the decision in *Perrow* predated the decision in *Walden*, in which the Supreme

17   Court made clear that "mere injury to a forum resident is not a sufficient connection to the

18   forum."  571 U.S. at 290.  For those reasons, plaintiff's reliance on the decision in *Perrow* is

19   unavailing.

20           As for GCE's online marketing strategies and website, through which plaintiff submitted

21   an online form and initiated her contact with GCE, plaintiff has not alleged that GCE targeted its

22   marketing to California or targeted her because she is in California.  Rather, plaintiff alleges that

23   GCE "direct[s] online internet ads to potential students that search online for accredited

24   programs, including potential students in California."  (Doc. No. 18 at ¶ 97.)  That is, GCE targets

25   their advertisements to anyone in the country who searches for online degree programs, not to

26   Californians specifically.  Such nationwide marketing activities do not show that GCE

27   purposefully directed its activities to California.  *See Pac. Overlander, LLC v. Kauai Overlander*,

28   No. 4:18-cv-02142-KAW, 2018 WL 5761766, at *4 (N.D. Cal. Oct. 31, 2018) (noting that

1   "courts have routinely rejected a finding that there is express aiming to a specific forum state

2   based on conducting business nationwide or advertising on nationally-available websites");

3   *Bradley v. T-Mobile US, Inc.*, No. 5:17-cv-07232-BLF, 2020 WL 1233924, at *15 (N.D. Cal.

4   Mar. 13, 2020) (noting that "[c]ourts have 'struggled with the question whether tortious conduct

5   on a nationally accessible website is expressly aimed at any, or all, of the forums in which the

6   website can be viewed'" and that "most courts have concluded that a nationwide advertising

7   campaign is not 'expressly aimed' to each state in which the advertisement appears") (quoting

8   *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229 (9th Cir. 2011)); *Cf. Mavrix Photo*,

9   647 F.3d at 1222, 1229–31 (finding express aiming requirement satisfied where the defendant

10  operated an active website that obtained a substantial number of hits from California residents,

11  hosted third-party advertisers that directed their advertisements at California residents, and had a

12  "specific focus on the California-centered celebrity and entertainment industries").

13        In short, plaintiff's allegations of GCE's nationwide marketing program, coupled with her

14  allegations that GCE's counselors in Arizona or Indiana called her to recruit her to enroll at the

15  University in accordance with that marketing program, even while knowing that she resided in

16  California, are insufficient to make a *prima facia* showing of personal jurisdiction over GCE.

17        In sum, the court finds that personal jurisdiction is lacking over all of the defendants in

18  this case.[8]  Accordingly, the court must next determine whether to dismiss or transfer this case.

19  _____

20  [8]  Plaintiff requests that the court permit jurisdictional discovery, which she contends "will reveal
    more details about Defendants' ties to the state, such as the ways in which Defendants directed
21  their advertising and communications to the state, the number of California residents impacted,
    the number of people employed in the state, and the monies paid to Defendants as a result of the
22  scheme . . .."  (Doc. No. 29 at 16.)  Defendants urge the court to deny plaintiff's request to
    conduct jurisdictional discovery as improper because plaintiff has not made a "colorable" claim
23  that personal jurisdiction exists as to each defendant and her request is "based on little more than
    a hunch that it might yield jurisdictionally relevant facts."  (Doc. No. 33 at 10) (citing *Boschetto*
24  *v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008).  "Discovery should ordinarily be granted where
    'pertinent facts bearing on the question of jurisdiction are controverted or where a more
25  satisfactory showing of the facts is necessary.'"  *Butcher's Union Local No. 498, United Foods &*
    *Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) (quoting *Data Disc, Inc. v.*
26  *Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977)).  "Where a plaintiff's claim of
    personal jurisdiction appears to be both attenuated and based on bare allegations in the face of
27  specific denials made by defendants, the Court need not permit even limited discovery."
    *Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995) (citation and internal quotation

28

1     *See* 28 U.S.C. § 1631.

2     **C.      Transfer**

3            If a "court finds that there is want of jurisdiction, the court shall, if it is in the interest of

4     justice, transfer such action or appeal to any other such court in which the action or appeal could

5     have been brought at the time it was filed . . .."  28 U.S.C. § 1631; *see Miller v. Hambrick*, 905

6     F.2d 259, 262 (9th Cir. 1990) (holding that a court's failure to exercise its discretion to transfer

7     under § 1631 constitutes an abuse of discretion).  "Transfer is appropriate under § 1631 if three

8     conditions are met:  (1) the transferring court lacks jurisdiction; (2) the transferee court could

9     have exercised jurisdiction at the time the action was filed; and (3) the transfer is in the interest of

10    justice."  *Cruz-Aguilera v. I.N.S.*, 245 F.3d 1070, 1074 (9th Cir. 2001).

11           Neither plaintiff nor defendants addressed the possibility that the court may transfer this

12    case to another district court if it were to find personal jurisdiction to be lacking.  Even though

13    defendants did not move in the alternative to transfer this case, the court may still transfer this

14    action pursuant to 28 U.S.C. § 1631.  *In re McCauley*, 814 F.2d 1350, 1352 (9th Cir. 1987) ("A

15    motion to transfer is unnecessary because of the mandatory cast of section 1631's instructions.");

16    *Prawoto v. PrimeLending*, 720 F. Supp. 2d 1149, 1159 (C.D. Cal. 2010) ("The court may transfer

17    an action to the appropriate federal court *sua sponte*.") (citing *Hays v. Postmaster Gen. of U.S.*,

18    868 F.2d 328, 331 (9th Cir. 1989)); *Boot Hill Biofuels, LLC v. Vitakem Nutraceutical, Inc.,* No.

19    2:10-cv-1215-GHK-FFM, 2010 WL 11595730, at *4 (C.D. Cal. June 16, 2010) ("Given our lack

20    of personal jurisdiction over Defendants, we must consider the possibility of transfer instead of

21    _____

22    marks omitted).  As discussed above, plaintiff's allegations do not show any conduct aimed
      expressly at California *specifically*; rather, plaintiff's only allegations of California contacts are

23    her allegations regarding defendant GCE's *nationwide* marketing program.  None of the
      discovery plaintiff now requests would alter the court's jurisdictional analysis in that regard.

24    Indeed, in her FAC, plaintiff estimates the amount of monies paid in tuition by Californians, the
      number of Californians enrolled in GCU's online programs, and the number of phone calls from

25    GCE placed to Californians each month—all of which she estimates based on her allegation that
      California represents approximately 12% of the country's population.  (Doc. No. 18 at ¶¶ 98, 144,

26    207.)  Plaintiff's own allegations suggest that California is not specifically targeted; the contacts
      are proportional.  That is, these allegations do not show any disproportionate focus or targeting of

27    California in GCE's nationwide marketing program compared to other states.  Thus, plaintiff's
      allegations provide no basis on which to grant leave to conduct jurisdictional discovery.

28

1   dismissal, notwithstanding the lack of a motion by the parties.").

2          Having found that this court lacks personal jurisdiction over the defendants, the only

3   remaining questions are:  (1) whether a transfer in lieu of dismissal would be in the interest of

4   justice and (2) which district court is the proper transferee court.  *See Cruz-Aguilera*, 245 F.3d at

5   1074.  "When determining whether transfer is in the interest of justice, courts have considered

6   whether the failure to transfer would prejudice the litigant, whether the litigant filed the original

7   action in good faith, and other equitable factors."  *Id.*  Generally, "transfer will be in the interest

8   of justice because normally dismissal of an action that could have been brought elsewhere is

9   'time-consuming and justice-defeating.'"  *Miller*, 905 F.2d at 262 (quoting *Goldlawr, Inc. v.*

10  *Heiman*, 369 U.S. 463, 467 (1962)) (citation omitted).

11         In light of the very detailed and extensive allegations in plaintiff's FAC regarding alleged

12  wrongdoing by defendants, and the fact that this case has now been pending in this court for a

13  year and a half, the court finds that plaintiff filed this action in good faith and that a dismissal at

14  this point on jurisdictional grounds would likely prejudice plaintiff.  Accordingly, the court

15  concludes that a transfer of this action is in the interest of justice.

16         The court also finds that the United States District Court for the District of Arizona is the

17  proper transferee court because that court "could have exercised jurisdiction at the time the action

18  was filed."  *Cruz-Aguilera*, 245 F.3d at 1074.  Notably, plaintiff alleges that defendant GCU is an

19  Arizona corporation (Doc. No. 18 at ¶ 7); that "[d]efendants have organized a team of GCE

20  officers and employees, who [d]efendants supervise in their recruitment out of its offices in

21  Phoenix, Arizona" (*id.* at ¶ 96); that "GCE directs its marketing team in Arizona" (*id.* at ¶ 97);

22  that plaintiff "transmitted formal acceptance of GCE's enrollment offer via the internet over

23  interstate wires from Fresno, California, to GCE in Arizona" (*id.* at ¶ 187); and that "defendants"

24  directed the allegedly misleading marketing program "in Arizona" (*id.* at ¶ 223).  In addition,

25  defendants do not dispute their ties to Arizona.  In connection with their pending motion to

26  dismiss, defendants request that this court take judicial notice of several corporate documents on

27  file with the California Secretary of State's Office showing that GCU is an Arizona nonprofit

28  corporation, and that GCE is a Delaware corporation with its principal place of business and

executive office in Phoenix, Arizona.[9]  (Doc. Nos. 24-8 at 2–3; 24-9–24-12.)  Accordingly, in the interests of justice, the court will transfer this action to the United States District Court for the District of Arizona pursuant to § 1631 in lieu of dismissal.  *See Boot Hill Biofuels, LLC*, 2010 WL 11595730, at *4 (transferring action to the U.S. District Court for the Eastern District of New York in the interest of justice, even though the parties did not request a transfer, where the plaintiff "failed to establish that Defendants are properly subject to personal jurisdiction in California," and the action could have been brought in the Eastern District of New York because the individual defendant was a New York resident and the corporate defendant had its headquarters in New York).

**CONCLUSION**

For the reasons stated above:

1.      Defendants' motion to dismiss this action (Doc. No. 24) is granted in part and denied in part as follows:

      a.      Defendants' motion to dismiss under Rule 12(b)(1) based on a lack of subject matter jurisdiction is denied;

      b.      Defendants' motion to dismiss under Rule 12(b)(2) based on a lack of personal jurisdiction is granted, in part:

            i.      This court lacks personal jurisdiction over the named defendants and will transfer this action in lieu of dismissal;

      c.      Defendants' motion to dismiss under Rule 12(b)(6) remains pending;

2.      Defendants' motion to strike allegations from the FAC (Doc. No. 25) remains pending; and

---

[9]  Public records are properly the subject of judicial notice because the contents of such documents contain facts that are not subject to reasonable dispute, and the facts therein "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b); *see also Intri-Plex Techs. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007).  The exhibits offered by defendants are matters of public record, made available on the websites of a governmental entity, and are properly subject to judicial notice. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  Moreover, the accuracy of the source of the records—the website of the California Secretary of State—cannot reasonably be questioned. Accordingly, defendants' request for judicial notice of these documents is granted.

3.      The Clerk of the Court is directed to transfer this case to the United States District Court for the District of Arizona forthwith.

IT IS SO ORDERED.

Dated:   **March 21, 2022**                                    _Dale A. Drozd_

UNITED STATES DISTRICT JUDGE